## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JASMYN WILLIAMS, individually and on    :
behalf of all others similarly situated,    :
   :
           Plaintiff,    :    C.A. No. 22-00510-MAK
   :
v.    :    CLASS ACTION
   :
PROGRESSIVE DIRECT INSURANCE    :    JURY TRIAL DEMANDED
COMPANY, an Ohio corporation,    :
   :
           Defendant.    :

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Jasmyn Williams ("Plaintiff"), by and through undersigned counsel, brings this

class action, individually and on behalf of all others similarly situated, against Progressive Direct

Insurance Company ("Progressive" or "Defendant") and alleges as follows:

### INTRODUCTION

1.       This is a class action on behalf of Plaintiff and all other similarly situated claimants

in Delaware who received a payment for the loss of a totaled vehicle from Defendant, where

Defendant used valuation reports prepared by Mitchell International, Inc. ("Mitchell") to

determine the actual cash value of the loss vehicles.  Through Mitchell's valuation, Defendant

systemically thumbs the scale when calculating the actual cash value ("ACV") of claimants' loss

vehicles by applying so-called "Projected Sold Adjustments" that are: (a) arbitrary; (b) contrary to

appraisal standards and methodologies; (c) not based in fact, as they are contrary to the used car

industry's market pricing and inventory management practices; (d) not applied by the major

competitor of Defendant's vendor Mitchell; and (e) on information and belief, not applied by

Defendant and Mitchell to insureds in other states like California and Washington.

2.       In the event of a "total loss" to an insured vehicle—*i.e.*, where repair of the vehicle

is impossible or uneconomical—Defendant's uniform insurance policies with Plaintiff and all putative Class members (defined below) promises to pay for the loss, limited to the ACV of the vehicle. Attached as Exhibit A is a copy of Plaintiff's Policy ("Policy"), which is materially identical to the policy for all members of the putative Class.

3.      When valuing total loss claims for vehicles, it is improper for an automobile insurance company, such as Progressive, to undervalue and underpay the claims by manipulating the data used to determine the ACV of the vehicles. Specifically, under its insurance policy terms and applicable Delaware law, Defendant has a duty to pay, and represents that it will pay, the ACV of a loss vehicle when adjusting total loss claims.

4.      Notwithstanding these obligations and representations, Defendant fails to fulfill this obligation by taking advantage of a valuation process that employs improper and unreasonable adjustments to reduce the value of comparable vehicles specified in the valuation reports, which in turn reduces the valuation of the total loss vehicles and the corresponding claim payment.

5.      Specifically, Defendant, through Mitchell, systemically applies a so-called "Projected Sold Adjustment" that results in a significant downward adjustment to the base values of the comparable vehicles used to calculate the ACV of Plaintiff's and Class members' total loss vehicles. This reduction is contrary to appraisal standards and methodologies and is not based in fact, as it is contrary to the used car industry's market pricing and inventory management practices. The adjustment is applied to each of the comparable vehicles on top of adjustments for differences such as mileage, options, and equipment. The only purported explanation for the downward adjustment appears on the last page of the valuation reports and is a general, nondescript statement claiming that the reduction is to "reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 7.

6.      To be clear, this case does not present a dispute about loss—which both Parties agree

exceeds ACV, such that the vehicle is a total loss. This is an issue that cannot be resolved through an appraisal process.

7.      Neither Progressive nor Mitchell has ever conducted any study or research to determine whether such "consumer purchasing behavior" exists and impacts ACV in the modern used-car market. Worse than this complete lack of curiosity is that Defendant thumbs the scale by discarding vast amounts of relevant data that contradict applying a Projected Sold Adjustment. For example, until July 2021, Defendant, through its vendors, simply threw out all data where the list price equaled or exceeded the sold price. And to this day, it persists in excluding from Projected Sold calculations some data where the list price equaled sold price and all data where the sold price exceeds the list price, even though examples abound of dealerships that charge more than advertised price to customers purchasing a vehicle with cash—i.e. not providing the dealer the opportunity to profit through financing the sale or acquiring a trade-in—which is particularly relevant to the inquiry of determining a vehicle's actual cash value. Defendant fails to control for whether the vehicle was purchased with cash, or whether there were ancillary purchases or transactions that may influence the "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at time of purchase, bought an extended warranty or service plan, or financed the purchase).

8.      Nevertheless, Progressive applies a Projected Sold Adjustment to the advertised (or listed) price of comparable vehicles when calculating the ACV of total-loss vehicles. For Plaintiff, the Projected Sold Adjustment was approximately 10.3% of each comparable vehicle's value prior to adjustments. To arrive at the Projected Sold Adjustment amount, however, Progressive, through third-party vendors, and as set forth above, categorically excludes transactions that undermine its flawed thesis: for example, transactions where the sold price exceeds list price, transactions from dealerships who market themselves as "no-haggle" dealerships, and every transaction where the sold price equaled the advertised price.

3

9.      As explained herein, the used auto market is such that, given the ubiquity of Internet advertising and shopping and developments in sophisticated pricing software, car dealerships simply do not negotiate off of Internet-advertised prices. Any difference between a list and sales price does not reflect a negotiation of the vehicle's cash value, but rather that a dealer shifted its profits to other components of the transaction: for example, profits made through financing or trade-in or ancillary products described above, or that the dealer applied a generally unavailable discount to the cash value of the vehicle (such as employee discount, loyalty discount, military discount, or friends/family discount). But Progressive ignores these market realities and is content with paying insureds and claimants below-market prices for their totaled vehicles.

10.     To arrive at its conclusion that consumers negotiate down the advertised price, Progressive, through its vendors, intentionally distorts the data, excludes transactions that undercut its false hypothesis, and ignores market realities, all for the purpose of applying a capricious and unjustified Projected Sold Adjustment to artificially deflate the value of total loss vehicles.

11.     This pattern and practice of undervaluing comparable and (thus) total loss vehicles when paying automobile total-loss claims through arbitrary, unsupported, and unjustified adjustments, which benefits Defendant at the expense of its insureds, Defendant violated the Delaware Consumer Fraud Act, breached its contracts, and breached its covenant of good faith and fair dealing.

### PARTIES

12.     Plaintiff Jasmyn Williams, at all relevant times, was a Delaware citizen. At all relevant times, Plaintiff was contracted with Progressive for automobile insurance. On or about October 30, 2020, Plaintiff was in a car wreck, and Defendant deemed her vehicle to be a total loss.

13.     Defendant Progressive Direct Insurance Company is an Ohio company with its principal place of business in Ohio. Defendant provides insurance coverage throughout the United States for first-party property damage under collision and/or comprehensivecoverage.

## JURISDICTION AND VENUE

14.     Minimal diversity exists under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1441(a)-(b), and 1453. Plaintiff and the proposed class members are citizens of the State of Delaware. Defendant is an Ohio Corporation that has its corporate headquarters in Ohio, and, at all relevant times hereto, Defendant was engaged in the business of marketing and selling insurance policies and adjusting insurance claims in the State of Delaware.

15.     Plaintiff estimates that there are more than 100 putative class members, and the aggregate compensatory damages (in the amount of the Projected Sold Adjustment that were deceptively deducted), claimed by Plaintiff and the Class are estimated in good faith to exceed $5,000,000.00.

16.     Venue is proper in this District under 28 U.S.C. § 1391, as a substantial portion of the conduct giving rise to Plaintiff's claims occurred in this District, and Defendant transacts business in this District.

## FACTUAL ALLEGATIONS

17.     On October 30, 2020, Plaintiff was involved in a car wreck and sustained physical damage to her vehicle.

18.     Like all members of the putative Class, Plaintiff made a property damage claim to Defendant.

19.     Pursuant to uniform policies and procedures, Defendant declared Plaintiff's vehicle to be a total loss and purported to offer her the ACV of her loss vehicle, as Defendant promised and represented it would under the uniform provisions of its insurance policies and Delaware law.

20.     When calculating its valuations and claims payments, Defendant systemically employs a routine "total loss settlement process." This process involves obtaining a "Vehicle Valuation Report" from Mitchell and then using and relying upon the valuation provided by

Mitchell to determine the ACV amount owed under the policy. Defendant provided a Mitchell Vehicle Valuation Report for Plaintiff on November 18, 2020. *See* Exhibit B.

21.     The Mitchell Vehicle Valuation Reports used by Defendant during the relevant period followed the same process, provided and disclosed the same or substantially the same material information, and presented that material information in the same or substantially the same format. These valuation reports purport to contain values for comparable vehicles for sale in the claimant's geographic area (or, in rare circumstances, recently sold). The reports also contain a purported valuation of the loss vehicle based upon these prices for comparable vehicles listed in the report. The report then adjusts the advertised prices of those comparable vehicles to account for differences in equipment, mileage, and vehicle configuration. Exhibit B at p. 7.

22.     In addition, however, the valuation reports used by Defendant make a further adjustment to each loss vehicle called a "Projected Sold Adjustment." For Plaintiff, Projected Sold Adjustments in the amounts of -$516.00, -$459.00, and -$489.00 respectively, all of which were approximately 10.3% of the respective vehicle's listed sale price, were applied to the three comparable vehicles. Exhibit B at pp. 4-6.

23.     Defendant provides no data specific to the comparable vehicles or any explanation of industry practices in its valuation reports to support *any* Projected Sold Adjustment, much less the specific downward adjustments used in Plaintiff's valuation report. Instead, the *only* explanation is buried on the last page of each report, stating in full: "Projected Sold Adjustment – an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 7.

24.     Defendant's Projected Sold Adjustments are deceptive. As part of a deceptive practice to lower the value of property claims, Defendant does not do what it says it will do – pay ACV. Moreover, as described above, Defendant provides no explanation or justification for the

Projected Sold Adjustment, much less the specific amount applied, other than the speculation that it "reflect[s] consumer behavior." Exhibit B at p. 7.

25.     In truth, Defendant's Projected Sold Adjustments do not reflect market realities (the context in which "consumer behavior" occurs) and run contrary to customary automobile dealer practices and inventory management, where list prices are priced to market to reflect the intense competition in the context of internet pricing and comparison shopping.

26.     Before the ubiquity of online advertising and shopping, "advertised" prices had very little to do with eliciting car buyers to particular dealerships—instead, car buyers generally went to their local used car dealership that had the desired vehicle in stock for sale. The "advertised" price was simply whatever price was listed on the physical window. And consumers could not, as they can now, easily compare that price to Internet advertisements of the same vehicle offered by competitors. As such, dealerships generally priced vehicles above market knowing that some consumers might be poor negotiators and they would realize an inflated profit on those sales. This above-market "window" price obviously allowed for negotiation, and a downward negotiation would often occur.

27.     But during the Class Period, that is simply no longer how the used car market operates. Now, given the need for Internet advertising, the prevalence of Internet shopping and consumer behavior, developments in sophisticated pricing software universally used by car dealerships, and the ease with which consumers can compare the advertised prices of identical vehicles across multiple competing dealerships, used car dealerships no longer price vehicles above market with room for—and the expectation of—negotiation. Instead, car dealerships use sophisticated pricing software—which provides the advertised prices of all competitors; the average "turn" of a given year, make and model; the amount for which vehicles have sold during a given time-period; etc.—and now appraise vehicles before acquiring them to price them to market and do

not negotiate from that price.

28.     This makes sense, because if a car dealership priced a vehicle above market with room for negotiation, consumers would simply not go to that dealership. This is because consumers can easily compare advertised prices and would seek out the vehicle priced to market, rather than the same vehicle priced at a higher amount (i.e., above market). Given the choice between paying less or paying more for an identical vehicle, consumers will choose to pay less.

29.     As such, a negotiated discount off the cash price is highly atypical and is not proper to include in determining ACV. The inclusion of this significant downward adjustment purportedly to "reflect consumer purchasing behavior" is particularly improper in the context of this action—insureds who have suffered a total loss of their vehicle and need to procure a replacement have limited time to search out the illusory opportunity to obtain the below-market deal Defendant assumes always exists without any explanation or support.

30.     Defendant's Projected Sold Adjustments are also contrary to appraisal standards. There are multiple generally-recognized and acceptable methodologies for determining ACV, including use of comparable vehicles. Defendant begins the process of valuing loss vehicles using comparative methodology but improperly deviates from that process by thumbing the scales against the insured. Defendant documents the loss vehicle's and each comparable vehicle's mileage, options, and trim, which are compared in the report, and make dollar adjustments accordingly. Plaintiff does not challenge these documented adjustments. At this stage of the process, Defendant abandons the comparative methodology and applies adjustments that are contrary to proper appraisal methodologies for determining ACV. Appraisers use advertised prices and only make adjustments based on observed and verifiable data; appraisal standards do not permit arbitrary adjustments from the advertised price based upon undocumented and unverifiable projections amounting to pure guesswork.

8

31.     Defendant thumbs the scale by discarding vast amounts of relevant data that contradict any application of a Projected Sold Adjustment and by failing to control for material variables, including whether there were ancillary purchases or transactions that may influence what is recorded as the "sales price" but do not influence the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

32.     Until July 2021, Defendant excluded from the calculation of the Projected Sold Adjustment all transactions in which the list price of a vehicle equaled the sold price. And even after July 2021, Defendant still excludes some transactions in which the list price of a vehicle equals its sold price.

33.     Moreover, Defendant has always excluded and continues to exclude from the calculation of the PSA all data transactions where the sold price of a vehicle exceeded its list price.[1] Without performing any investigation or study, Defendant simply assumes all such transactions are anomalies, notwithstanding that they occur frequently.

34.     Likewise, Defendant has not exercised even a modicum of curiosity to investigate whether market realities support the application of a Projected Sold Adjustment. Nor does Defendant or its vendors attempt to verify—even a single time—for those transactions where the advertised price exceeded sold price, whether the reason for the reduction was negotiation of the cash price of the vehicle and not some other (far more likely) reason, some of which are discussed herein.

35.     Neither Progressive's form Policy nor Delaware law permit reducing a vehicle's value for invented or arbitrarily assumed justifications.

---

[1] It may seem counterintuitive that a vehicle would sell for more than the amount for which it is advertised, but it is actually quite common for this to occur. As just one example, dealerships often list a vehicle at a certain advertised price (say, $20,000.00), but the fine print will explain that the advertised price assumes a down payment of, say, $2,000.00. In this scenario, the data would show an "advertised" price of $20,000.00 but a "sold" price of $22,000.00.

36.     Moreover, the accuracy of Defendant's data is, at best, suspect, as it contains a significant number of transactions where the advertised date in the database comes after the sold date. As a matter of simply chronology, it makes no sense to advertise a vehicle after it is sold. But here, too, Defendant makes no effort to control for this obvious flaw in the data.

37.     These irredeemable and unjustifiable errors, of course, skew the data in favor of Defendant to the detriment of its insureds.

38.     Moreover, examples abound demonstrating the glaring error of Defendant's cherry-picking practices. For example, related to the exclusion of sales prices greater than list prices, all advertised prices for comparable vehicles listed in Defendant's valuation reports are scraped from Internet sources—specifically Cars.com, Autotrader.com, Vast.com, and TrueCar.com. The advertised prices many dealerships publish on these websites include discounts for consumers who are financing and providing a trade-in. Thus, a consumer who was not financing the vehicle through the dealership or who was not trading in a vehicle—obviously, insureds who sustained a total loss almost certainly are not trading a vehicle when purchasing a replacement vehicle—would have to pay in cash more than the price listed on sources where Mitchell scrapes advertisements for comparable vehicles. In determining the ACV of Plaintiff's and class members' totaled vehicles, there is no justification for Defendant to have excluded those transactions from calculating the Projected Sold Adjustment, while only including transactions where the sold price was recorded as less than the list price.

39.     Put simply, there is no justification for Progressive to exclude such transactions as outliers or mistakes when justifying how it calculates the amount of the so-called Projected Sold Adjustment. Doing so serves only to skew the data to meet Defendant's unjustified, unsupported, and uninvestigated assumption that the list price of comparable vehicles should always be reduced to pay insureds less.

40.     Defendant further fails to control for whether the vehicle was purchased with discounts unavailable to the public (e.g., employee discounts, military discounts, friends/family discounts, etc.).

41.     Defendant also fails to control for whether the vehicle was purchased with cash (which is what is relevant to actual *cash* value), or whether there were ancillary transactions that may influence the recorded "sales price" but not ACV (e.g., whether the dealership discounted because the customer agreed to finance the purchase through the dealership, or whether the customer traded in a vehicle at the time of purchase, etc.).

42.     In these instances, the ACV of a vehicle remains its cash price to market; the dealership simply transferred the anticipated profit either to interest on a financed purchase, the sale of an optional ancillary product, or by reducing what it would have offered in trade-in value.

43.     The impropriety and arbitrariness of Defendant's Projected Sold Adjustments is further demonstrated by the fact that Mitchell's primary competitor in providing valuation reports to insurance companies—CCC Intelligent Solutions—does not apply projected sold adjustments in this manner. Instead, CCC Intelligent Solutions uses list prices.

44.     On information and belief, the impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Progressive entities do not apply these adjustments when valuing total losses in California or Washington (at least).

45.     Plaintiff and each member of the class were damaged by Defendant's application of these Projected Sold Adjustments because they were not paid the ACV they would have received had Defendant applied proper methodologies and appraisal standards.

46.     Were it not for this deceptive and improper adjustment, the "Base Value" in each valuation report would have been higher, resulting in a higher "settlement value" and in turn a higher payment by Defendant for ACV.  Specifically, for Plaintiff, were it not for this deceptive and

11

improper adjustment, the payment of ACV by Defendant would have been $488.00 higher,[2] before adding the related increase in payments for applicable sales taxes.

47.     To be clear, this case does not present a dispute about the amount of loss. Plaintiff does not contest Defendant's determination of the amount of loss, nor that the amount of loss exceeded the vehicle's ACV, such that the vehicle was determined by Defendant to be a total loss, i.e., totaled (uneconomical to repair).

48.     Moreover, Plaintiff does not contest the *amount* of the Projected Sold Adjustment. Said another way, it is not that Defendant believes the Policy and Delaware law allow for a 6% Projected Sold Adjustment, while Plaintiff believes only a 3% adjustment is permitted. Rather, Plaintiff alleges that *no Projected Sold Adjustment is permitted at all* as a matter of law.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), and seeks to be appointed to represent the following proposed Class:

> All Delaware citizens insured by Defendant who, from the earliest allowable time through the date an Order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on a valuation report prepared by Mitchell and the ACV was decreased based upon Projected Sold Adjustments applied to the comparable vehicles used to determine ACV.

50.     Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Judge(s) and Court staff assigned to this case and their immediate family members.

51.     Plaintiff reserves her right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or narrowed, divided into additional

---

[2] $488.00 is the average of the Projected Sold Adjustments applied to each of the three comparable vehicles in Plaintiff's valuation report.

subclasses, or modified in any other way.

52. **Numerosity.** The members of the Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are thousands of Class members, the precise number is unknown to Plaintiff but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

53. **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a. Whether Defendant systemically used Mitchell's Vehicle Valuation Reports in adjusting total loss claims to determine ACV;

    b. Whether the Mitchell Vehicle Valuation Reports included Projected Sold Adjustments to the value of the comparable vehicles that reduced the base value, and thus the claim amount paid by Defendant for the ACV of Plaintiff's and Class members' total loss vehicles;

    c. Whether representing to claimants that the Mitchell valuation equated with the total loss vehicle's ACV was deceptive;

    d. Whether Defendant's deceptive acts and improper practices injured Plaintiff and members of the Class;

    e. Whether Defendant's acts violated its obligations under the policy of insurance;

    f. Whether Plaintiff and the Class are entitled to compensatory damages, and if so, the calculation of damages; and

    g. Whether Plaintiff and members of the Class are entitled to an injunction restraining

Progressive's future deceptive acts and practices.

54.     **Typicality.** The claims of the Plaintiff, who is the representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiff, depend on a showing of the acts of Progressive giving rise to the right of Plaintiff to the relief sought herein. There is no conflict between the individually named Plaintiff and the other members of the proposed Class with respect to this action, or with respect to the claims for relief set forth herein.

55.     **Adequacy of Representation.** Plaintiff is an adequate representative of the Classbecause Plaintiff's interests do not conflict with the interests of the other Class members whom she seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, whereinsurers breached contracts with insureds. The interests of the Class will be fairly and adequatelyprotected by Plaintiff and her counsel.

56.     **Superiority.** A class action is superior to any other available means for the fair andefficient adjudication of this controversy, and no unusual difficulties are likely to be encounteredin the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, such that it would be impracticable for the Class members to individually seek redress for Defendant's wrongful conduct. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive

supervision by a single court.

## COUNT 1
## VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
### 6  Del. C. §§ 2511, *et seq.*

57.     Plaintiff repeats and re-alleges all previously alleged paragraphs as if fully alleged herein.

58.     This Count is brought by the Plaintiff on behalf of the Class.

59.     Defendant is a "person" as engaged in the sale of "merchandise" as defined by 6 Del. C. § 2511(6), (7).

60.     The Delaware Consumer Fraud Act ("Delaware CFA"), 6 Del. C. §§ 2511, *et seq.*, prohibits the act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is an unlawful practice.

61.     As alleged herein, Defendant, through its agents, employees, and/or subsidiaries, violated the Delaware CFA by knowingly and intentionally concealing and failing to disclose material facts regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles in order to reduce their market value and, as a result, the amount of Defendant's total-loss payments to insureds, as detailed above.

62.     Defendant also failed to comply with Delaware law, which, when insurance companies are determining "fair market value" of insured's vehicles, requires that "adjustment[s] shall be based on the fair market value at the time of loss of a like make, model, condition and equipped automobile[,] and provides that "the adjuster shall be prepared to substantiate his offer with the average quotation from three reputable used car dealer managers in the area of claimant's

15

residence" and that "[t]he only exception would be where the vehicle that is the subject of the claim so singularly unique so that the adjuster must widen the each for comparable vehicles in order to accurately calculate the value of the totaled vehicle." Del. Dept. Ins. Auto Bulletin No. 1, Reissued January 25, 2018.

63.     By knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles, and Defendant's failure to comply with Delaware law, as detailed above, Defendant engaged in one or more unfair or deceptive business practices prohibited by the Delaware CFA.

64.     Defendant's misrepresentations and omissions regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles were made to Plaintiff and the Class members in a uniform manner.

65.     Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppression of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff and the Class members, about Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles in order to reduce the amount of Defendant's total-loss payments to its insureds.

66.     The facts regarding Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles that Defendant knowingly and intentionally misrepresented, omitted, concealed, and/or failed to disclose would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiff and the Class members, who consider such facts to be important to their purchase decisions with respect to Defendant's insurance coverage.

67.     Plaintiff and Class members had no way of discerning that Defendant's

representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff and Class members did not, and could not, unravel Defendant's deception on their own.

68.     Defendant had an ongoing duty to Plaintiff and the Class members to refrain from engaging in unfair or deceptive practices under the Delaware CFA in the course of its business. Specifically, Defendant owed Plaintiff and Class members a duty to disclose all the material facts concerning its application of an arbitrary Projected Sold Adjustment to comparable vehicles because Defendant possessed exclusive knowledge of those facts, it intentionally concealed those facts from Plaintiff and the Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

69.     Plaintiff and the Class members were aggrieved by Defendant's violations of the Delaware CFA because they suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's knowing and intentional misrepresentations, omissions, concealments, and failures to disclose material facts regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles, including that the Projected Sold Adjustment is arbitrarily selected and applied in an inconsistent manner designed to decrease Defendant's total-loss payments under the Policy.

70.     Plaintiff and the Class members purchased Defendant's insurance coverage in reliance on Defendant's misrepresentations, omissions, concealments, and/or failures to disclose material facts regarding its purported payment of ACV in the event of a total loss and Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles to artificially reduce its total-loss payments to insureds.

71.     Had Defendant not engaged in the deceptive acts and practices alleged herein, Plaintiff and Class members would not have purchased insurance coverage from Defendant or

would not have paid as much for it and, thus, they did not receive the benefit of the bargain and/or they suffered out-of-pocket loss.

72.     Defendant's violations of the Delaware CFA present a continuing risk of future harm to Plaintiff and the Class members.

73.     Plaintiff and the Class members seek an order enjoining Defendant's unfair and deceptive acts or practices in violation of the Delaware CFA and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

## COUNT 2
## BREACH OF CONTRACT

74.     Plaintiff repeats and re-alleges all previously alleged paragraphs, except for the previous incorporating paragraph, as if fully alleged herein.

75.     This Count is brought by the Plaintiff on behalf of the Class.

76.     Plaintiff and each of the other Class members were insured under a policy issued by Defendant, as described herein.

77.     Plaintiff and each of the other Class members made claims under their insurance contracts, which Defendant determined to be first-party total losses under the insurance contract, and additionally determined to be covered claims.

78.     Pursuant to the above-described contractual provisions, upon the total loss of their insured vehicles, Defendant purported to pay Plaintiff and each of the other Class members the ACV of their totaled vehicles.

79.     Defendant, however, failed to pay the ACV of Plaintiff's and Class members' vehicles because Defendant applied an arbitrary and capricious Projected Sold Adjustment to comparable vehicles in order to reduce their market value and, as a result, Defendant's total-loss payments to insureds.

80.     Defendant failed to pay Plaintiff and each of the other Class members the promised

ACV of their total-loss vehicles and thereby breached its contract with Plaintiff and each of the other Class members.

81.     As a result of such contractual breaches, Plaintiff and each of the other Class members have been damaged and are entitled to recover damages, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

### COUNT 3
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

82.     Plaintiff repeats and re-alleges all previously alleged paragraphs, except for the previous incorporating paragraphs, as if fully alleged herein.

83.     This Count is brought by the Plaintiff on behalf of the Class.

84.     Every contract, including the Policy, contains an implied covenant of good faith and fair dealing. The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.

85.     Disputes involving the exercise of good faith can arise when one party is given discretion in performing its obligations under the contract. Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

86.     To the extent the Policy provides Defendant with in calculating the ACV of an insured's total-loss vehicle, Defendant exercised its discretion unreasonably, with an improper motive, and in a manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties, specifically, to arbitrarily reduce the amount of their total-loss payments to insureds, as alleged herein.

87.     Defendant breached the covenant of good faith and fair dealing by, *inter alia*:

19

a. Intentionally inventing and applying Projected Sold Adjustments to undervalue comparable vehicles, and, in turn, insureds' total-loss vehicles;

b. Failing to conduct *any* investigation or study or research into whether the Projected Sold Adjustment (i) reflects the used auto market, (ii) is based on accurate data or extrapolations, (iii) is consistent with accepted appraisal methods and practices, or (iv) has any justification whatsoever;

c. Failing to pay insureds the ACV of their total-loss vehicles;

d. Interpreting the terms and conditions of their insurance policies in an unreasonable manner solely in an effort to understate the value of total-loss vehicles and avoid paying insureds the ACV on their total-loss claims;

e. Inventing spurious grounds for undervaluing total loss claims that are hidden, not specific in dollar amount, not adequately explained, and unreasonable.

88.    Defendant's breaches of the covenant of good faith and fair dealing have caused damages to Plaintiff and the Class. Plaintiff's and the Class members' damages include the amounts improperly deducted by Defendant from its payments to insureds on the basis of a Projected Sold Adjustment.

## COUNT 4
## DECLARATORY JUDGMENT

89.    Plaintiff repeats and re-alleges all previously alleged paragraphs, except for the previous incorporating paragraphs, as if fully alleged herein.

90.    This Count is brought by the Plaintiff on behalf of the Class.

91.    A dispute between Plaintiff and the Class and Defendant is before this Court concerning the construction of the auto insurance policies issued by Defendant, and the rights of Plaintiff and the Class arising under that policy.

92.    Plaintiff, individually and on behalf of the Class, seeks a declaration of rights and

liabilities of the parties herein. Specifically, Plaintiff seeks a declaration that in paying total-loss claims by first-party insureds, it is a breach of Defendant's insurance contract, as well as a violation of law, for Defendant to base the valuation and payment of claims on values of comparable vehicles that have been reduced by Projected Sold Adjustments that are (a) arbitrary and capricious, (b) contrary to industry practices and consumer experiences (and therefore not reflective of the vehicle's fair market value), and/or (c) not reasonably specific or appropriate as to dollar amount.

93.     Defendant's unlawful common policy and general business practice as described herein are ongoing. Accordingly, Defendant has breached, and continues to breach, the express terms of its contracts of insurance with Plaintiff and members of the Class.

94.     As a result of these breaches of contract, Plaintiff and the Class members have been injured.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully seeks judgement in Plaintiff's favor and in favor of the Class as follows:

A. An Order certifying this action as a Class Action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B. An award of damages (including actual, compensatory, statutory, and punitive, as provided by law) and restitution to Plaintiff and the Class in an amount to be determined at trial, plus pre- and post-judgment interest, in accordance with law;

C. Disgorgement of Defendant's profits;

D. Appropriate preliminary and/or final injunctive or equitable relief against the conduct of Defendant's described herein;

E.  An award Plaintiff's and the Class' costs of suit, including reasonable attorneys' fees to the extent allowable by law; and

F.  An award such further and additional relief as is necessary to redress the harm caused by Defendant's unlawful conduct and as the Court may deem just and proper under the circumstances.

July 5, 2022

**BAILEY & GLASSER LLP**

Of Counsel:*

*/s/ David A. Felice*

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com

David A. Felice (#4090)
2961 Centerville Road, Suite 302
Wilmington, Delaware 19808
Telephone: (302) 504-6333
dfelice@baileyglasser.com

*Counsel for Plaintiff and the Proposed Class*

**EDELSBERG LAW, P.A.**
Scott Edelsberg
Christopher Gold
20900 NE 30th Ave., Suite 417
Aventura, Florida 33180
Telephone: (786) 289-9471
scott@edelsberglaw.com
chris@edelsberglaw.com

* pro hac vice forthcoming