**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JASMYN WILLIAMS, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | Civil Action No. 22-0510-MAK |
| PROGRESSIVE DIRECT INSURANCE COMPANY, an Ohio corporation, | |
| Defendant. | |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Dated: August 2, 2022

David A. Felice (#4090)
**BAILEY & GLASSER LLP**
2961 Centerville Road, Suite 302
Wilmington, Delaware 19808
Telephone: (302) 504-6333
dfelice@baileyglasser.com

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................................ 1

II.   RELEVANT FACTS ......................................................................................................... 2

III.  LEGAL STANDARD ........................................................................................................ 3

IV.  ARGUMENT ...................................................................................................................... 4

    A.   Breach of Contract ...................................................................................................... 8

    B.   Breach of the Covenant of Good Faith and Fair Dealing .................................................. 11

    C.   Delaware Consumer Fraud Act ...................................................................................... 14

        1.   Plaintiff alleges a claim under the DCFA with sufficient particularity .......................... 14

        2.   Allegations that an insurance company commits an unlawful act when processing insurance claims are sufficient to state a claim under DCFA ................................................ 16

    D.   Declaratory Judgment .................................................................................................. 17

V.   CONCLUSION ................................................................................................................ 20

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anysa Ngethpharat v. State Farm Mut. Auto. Ins. Co.*,
    499 F. Supp. 3d 908 (W.D. Wash. 2020)................................................................ 19

*Butta v. GEICO Cas. Co.*,
    400 F. Supp. 3d 225 (E.D. Pa. 2019) ................................................................... 17

*Clippinger v. State Farm Mut. Auto. Ins. Co.*,
    2020 U.S. Dist. LEXIS 214856 (W.D. Tenn. Nov. 17, 2020)........................... 11, 13

*Davis v. Progressive Advanced Ins. Co.*,
    2021 U.S. Dist. LEXIS 26954  (E.D. Pa. Feb. 12, 2021) .................................... 10

*eCOMMERCE Indus. v. MWA Intelligence, Inc.*,
    No. 7471-VCP, 2013 Del. Ch. LEXIS 245 (Del. Ch. Sep. 30, 2013)................... 12

*Edmunds Holding Co. v. Autobytel, Inc.*
    598 F. Supp. 2d 606 (D. Del. 2009)..................................................................... 19

*Fitzsimmons v. McCorkle*,
    59 Del. 94 (Del. 1965) ......................................................................................... 4

*Fleisher v. Fiber Composites, LLC*,
    No. 12-1326, 2012 U.S. Dist. LEXIS 157343 (E.D. Pa. Nov. 2, 2012) ................. 20

*Gerber v. Enter. Products Holdings, LLC*,
    67 A.3d 400 (Del. 2013) ...................................................................................... 12

*Guidant Sales Corp. v. George*,
    2006 WL 3307633 (D. Minn. Nov. 14, 2006) ...................................................... 17

*Hallowell v. State Farm Mut. Auto. Ins. Co.*,
    443 A.2d 925 (Del. 1982) ..................................................................................... 3

*Homsey v. Vigilant Ins. Co.*,
    496 F. Supp. 2d 433 (D. Del. 2007)................................................................. 15, 16

*In re Checking Acct. Overdraft Litig.*,
    694 F. Supp. 2d 1302 (S.D. Fla. 2010) ................................................................ 19

*Johnson v. Geico Cas. Co.*,
    516 F. Supp. 2d 351 (D. Del. 2007)............................................................. 15, 16, 20

*Johnson v. Gov't Emples. Ins. Co.*,
    2014 U.S. Dist. LEXIS 81403 (D. Del. June 16, 2014)........................................ 13

*Lundquist v. First Nat'l Ins. Co. of Am.*,
   2018 U.S. Dist. LEXIS 113509 (W.D. Wash. Jul. 9, 2018) .................................................. 13

*McNichols v. Geico Gen. Ins. Co.*,
   2021 U.S. Dist. LEXIS 135674 (D. Conn. Jul. 21, 2021)........................................................ 10

*McPheeters v. United Services Automobile Association*,
   549 F.Supp.3d 737 (S.D. Ohio 2021) .................................................................................. 10

*MedImmune, Inc. v. Greentech, Inc.*,
   549 U.S. 118 (2007)............................................................................................................ 17

*Metropolitan Mut. Fire Ins. Co. v. Carmen Holding Co.*,
   220 A.2d 778 (Del. 1966) .................................................................................................... 4

*SmithKline Beecham Corp. v. Continental Ins. Co.*,
   2004 WL 1773713 (E.D. Pa. Aug. 4, 2004) ........................................................................ 18

*New Castle County v. Nat'l Union Fire Ins. Co.*,
   243 F.3d 744 (3d Cir. 2001)................................................................................................ 4

*Nova Financial Holdings, Inc. v. Bancinsure, Inc.*,
   2012 WL 1322932 (E.D. Pa. Apr. 17, 2012) ...................................................................... 18

*Novellino v. Life Ins. Co. of North America*,
   216 A.2d 420 (Del. 1966) .................................................................................................... 3

*Sammons v. Hartford Underwriters Ins. Co.*,
   2010 Del. Super. LEXIS 134 (Del. Super. Apr. 1, 2010) ............................................... 14, 15

*Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*,
   742 F.2d 786 (3d Cir. 1984)................................................................................................ 14

*Sigler v. GEICO Cas. Co.*,
   967 F.3d 658 (7th Cir. 2020) ........................................................................................... 9, 10

*SmithKline Beecham Corp. v. Continental Ins. Co.*,
   2004 WL 1773713 (E.D. Pa. Aug. 4, 2004) ........................................................................ 20

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
   840 A.2d 606 (Del. 2003) .................................................................................................... 8

*Winshall v. Viacom Int'l, Inc.*,
   76 A.3d 808 (Del. 2013) ...................................................................................................... 12

*Wright v. GEICO Cas. Co.*,
   2021 U.S. Dist. LEXIS 184553 (M.D. La. Sep. 27, 2021) ...................................................... 9

*Yavar Rzayev, LLC v. Roffman*,
   2015 Del. Super. LEXIS 433 (Del. Super. Aug. 31, 2015) .................................................... 14

*Zuern v. IDS Prop. Cas. Ins. Co.*,
   2020 U.S. Dist. LEXIS 78260 (W.D. Wash. May 4, 2020) ................................................ 11, 13

**Statutes**

28 U.S.C. § 2201 .................................................................................................................... 19

**Other Authorities**

Fed. R. Civ. P. 8 ..................................................................................................................... 19

Fed. R. Civ. P. 9 ..................................................................................................................... 14

Fed. R. Civ. P. 12 ..................................................................................................................... 3

Couch on Insurance 3d at § 175:40, § 176:4 ................................................................................ 9

New Appleman On Insurance Law Library Edition, Vol. 6 § 62.08(1)(a) ..................................... 9

## I.    <u>INTRODUCTION</u>

Progressive is cooking the books; it is asserting something to its insureds that is false; it is asserting something to its insureds that it knows is false.

Progressive and its vendors have access to data reflecting millions of used auto transactions across the country showing the online listed price and the sold price for each vehicle. This data shows there is essentially no difference between the online listed prices and the sales prices of used autos—car dealerships price the vehicles to market and do not negotiate down from that listed cash price, meaning that vehicles are sold for their listed price. Incredibly, Progressive simply ***ignores and excludes that data***, and applies a "projected sold adjustment" ("PSA") to the listed price of comparable vehicles when calculating the "actual cash value" ("ACV") of totaled vehicles, solely for the purpose of paying less than ACV and increasing its own profits. This unconscionable behavior constitutes a breach of contract and of the covenant of good faith and fair dealing, as well as a violation of the Delaware Consumer Fraud Act ("DCFA").

When Progressive determines that an insured vehicle that has been in an accident is a "total loss"—meaning it is impossible or uneconomical to repair the damage to the vehicle—insureds are entitled under Progressive's insurance policy to the vehicle's ACV, which is synonymous with fair market value. Progressive calculates market value by taking the average price of comparable vehicles, adjusted for differences between the comparable vehicles and the insured vehicle in mileage, condition, and equipment. If this were the end of the story, there would be no claim— under the Policy and Delaware law, this is the proper way to calculate a vehicle's market value. But to Progressive, this results in too high a number and not enough profit. So Progressive does not stop there; instead, it applies a PSA to each comparable vehicle's listed price, purportedly to

reflect the percentage that will be negotiated off the listed price, which reduces the calculated amount and results in Progressive paying significantly less than the ***actual*** cash market value.

This is based on a false assumption—worse, Progressive knows it is false. The notion that car dealerships price vehicles above market value and then negotiate down from that price is perhaps a relatively common misconception, but it is antiquated and false. As discovery will show, for a variety of reasons, but primarily because of the ubiquity of internet advertising and shopping, this notion has not been true for at least the last 15 years or so. Car dealerships no longer have a captive audience whose only ability to compare the advertised price on a car window is (if at all) through week-old newspaper clippings. So, dealerships now price the vehicles to market and do not deviate from that price. Unsurprisingly, then, the data Progressive and its vendors collect reflects this reality and shows the lack of a difference between online advertised prices and sold prices. Unhappy with this empirical evidence, however, Progressive simply ignores it and applies the made-up, meretricious, and capricious PSA.

Plaintiff's factual allegations that the online listed prices of a given vehicle type are the amount for which they are sold and therefore constitute the market value of that vehicle type are plausible. Plaintiff's allegations that Progressive knows this to be the case and yet represents the opposition are plausible. As such, Plaintiff respectfully submits the Motion should be denied.

## II. <u>RELEVANT FACTS</u>

Plaintiff sustained damage to her vehicle, which Defendant determined to constitute a total loss by invoking its ACV limit on liability. D.I. 11 at ¶¶ 2, 17-19. Defendant determines ACV by, through a vendor, taking the online listed prices of comparable vehicles, and imposing adjustments based on differences in condition, mileage, and options. *Id*. at ¶ 21.

2

This case, however, is about the line-item adjustment Plaintiff challenges, which is the PSA. Defendant applies the PSA purportedly to represent the difference between what the comparable vehicles' dealers listed as the price of the vehicle and the (lesser) amount they would actually accept. *Id*. at ¶ 23. Defendant make such representation notwithstanding that it did not conduct even a modicum of research or inquiry into whether its assumption is correct. *Id*. at ¶ 7. In any event, the very data on which the PSA is purportedly based shows the opposite is true, i.e., that there is no difference between average listed prices and average sold prices. *Id*. at ¶¶ 7-8, 10, 31-39. This data is consistent with the used car market, where, because of the ubiquity of internet advertising and shopping, and the development of sophisticated pricing tools, dealers price the vehicles to market and do no negotiate off that cash price. *Id*. at ¶¶ 9, 25-29. Moreover, application of the PSA conflicts not only with the empirical data and the market realities, but also with sound appraisal techniques/principles for calculating ACV. *Id*. at ¶ 30. As such, Defendant undercalculated the ACV of Plaintiff's vehicle by 10.3%. *Id*. at ¶¶ 8, 46.

### III.    LEGAL STANDARD

Plaintiff agrees that the familiar Fed. R. Civ. P. 12(b)(6) standard governs as set forth in Defendant's Memorandum. D.I. 16 at 7.

As for interpretation of insurance policies, under Delaware law, insurance policies are considered adhesion contracts, not generally the result of arms-length negotiation. *E.g.*, *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982). As such, the rules of construction "differ from those applied to most other contracts." *Id*. If a policy is unambiguous, it is interpreted according to its plain meaning. *Id*. If the policy is ambiguous, however, the doctrine of *contra proferentem* requires the Court to interpret the policy in favor of the insured. *Id*. (citing *Novellino v. Life Ins. Co. of North America*, 216 A.2d 420, 422 (Del. 1966)). Under this doctrine, courts look

3

to "the reasonable expectations of the insured at the time when he entered the contract[.]" *Id.* at 927. A policy is ambiguous if it is susceptible to more than one reasonable interpretation. *E.g.*, *New Castle County v. Nat'l Union Fire Ins. Co.*, 243 F.3d 744, 750 (3d Cir. 2001).

## IV.    ARGUMENT

As set forth below, courts universally agree that Plaintiff's allegations are sufficient to state viable claims for breach of contract and of the covenant of good faith and fair dealing;[1] thus, there is little question that this litigation will proceed. Plaintiff could simply cite to the consensus case law on the subject, point out that the allegations raise factual disputes that cannot be resolved on the pleadings alone, and leave it at that. But, because this case is brought as a class action, Plaintiff suspects the Court may want a broader understanding of what it can expect in the forthcoming litigation. As such, Plaintiff believes it would be helpful to give a background explanation of how the ACV of motor vehicles is determined, and a general explanation of her theory of liability.

Both as defined in Defendant's Policy and under longstanding Delaware law, ACV is synonymous with market value. *E.g.*, *Metropolitan Mut. Fire Ins. Co. v. Carmen Holding Co.*, 220 A.2d 778, 780 (Del. 1966). In turn, market value is the amount willing buyers and willing sellers would agree to as the sale price of a given property. *Id.* So the $64,000.00 (more or (usually) less) question is how to determine the amount a willing buyer would agree to pay and a willing seller would agree to accept for a given vehicle? Under Delaware law, the preferred method, for property where it is possible, is the "comparable sales" method. *See*, *e.g.*, *Fitzsimmons v. McCorkle*, 59 Del. 94, 101 (Del. 1965). This is unsurprising: If the goal is to determine the amount willing buyers will pay and willing sellers will accept for a 2020 Honda Civic and other 2020 Honda Civics are

---

[1] There is no precedent on whether the allegations state a viable claim for violation of the DFCA, and Plaintiff is willing to concede that question is subject to reasonable debate. But for purposes of this section, it is irrelevant whether this litigation will proceed with or without the DFCA claim.

4

being sold in the relevant geographic market, those sale amounts establish the amount buyers and sellers are agreeing to, and thus establish the base market value.

For obvious reasons, however, this does not conclude the analysis. Instead, adjustments are necessary to account for differences between the comparable properties (vehicles) and the vehicle at issue. For example, that a 2020 Honda Civic with 10,000 miles will sell for $20,000.00 does not mean that one with 15,000 miles will sell for $20,000.00; that a 2020 Honda Civic in excellent condition will sell for $20,000.00 does not mean that one in average condition will sell for $20,000.00; and that a 2020 Honda Civic with leather seats will sell for $20,000.00 does not mean one with cloth seats will sell for $20,000.00. If such differences between the insured vehicle and a comparable vehicle exist, adjustments to the comparable vehicle's price should be made accordingly.

Plaintiff's theory—based on a wealth of case law and treatises on this oft-litigated question of ACV—is that there is no platonic ACV dollar-and-cents amount that an insurer must ascertain and thus necessarily breaches its contract if it fails to accurately identify that exact amount. It is not as if the ACV of a given insured vehicle is, say, $15,211.28, and thus the insurer necessarily breaches its contract if it calculates ACV to be, say, $15,211.12. Rather than being an exact dollar-and-cents amount, ACV is a methodology. Said another way, ACV is a method by which a party estimates what the vehicle would sell for in a hypothetical world in which the insured sold the vehicle immediately prior to the accident. Such a hypothetical world does not exist, and so an ACV amount cannot be "wrong" solely because it is not the amount for which the vehicle was hypothetically sold. For that matter, it is impossible know what the vehicle would actually hypothetically sell for, and so it is impossible to know whether a given dollar-and-cents amount, by itself, is the "right" or "wrong" amount.

5

Because ACV is a method for calculating the market value of insured property (a vehicle, here), an insurer does not breach its contract so long as it utilizes the proper method and makes valid adjustments in making such calculation. By contrast, an insurer does breach its contract if it utilizes an improper method of making such calculation. Perhaps the best way of explaining is through an example. Assume there are twenty identical 2020 Honda Civics for sale in a given geographic area ranging from $19,700.00 to $20,200.00. An insurer follows a proper ACV methodology and, as part of that methodology, picks five of them to utilize for its calculation, adjusted for verifiable differences in mileage at a reasonable cents-per-mile rate, which results in an ACV calculation of $19,995.00. If it had picked five different vehicles but otherwise made the same cents-per-mile adjustment based on differences in mileage, the resulting ACV calculation would have been $20,065.00. Plaintiff believes the insurer has not breached the contract by $70.00—in a hypothetical world, maybe the insured would have sold the vehicle for $20,065.00 or maybe for $19,995.00 (or maybe some other slightly different amount), but because the insurer reasonably followed a proper methodology, its ACV calculation does not constitute a breach solely because it could have picked five different vehicles and therefore (necessarily) arrived at a slightly higher or lower amount.

By that same token, however, an insurer ***does*** breach its contractual obligations if it utilizes improper techniques or methodologies in estimating the amount for which an insured vehicle would have hypothetically been sold. And if so, the resulting damages would be calculated by removing the improper technique/adjustment. Again, an example crystallizes this point. Assume that the standard 2020 Honda Civic seats are cloth seats, and the insured did not put aftermarket leather seats on her vehicle. Assume that the insurer selects five comparable vehicles, and there is no indication one way or another whether they have aftermarket leather seats. The insurer follows

a proper methodology, except that it assumes all five vehicles had aftermarket leather seats and thus imposes a $500.00 downward adjustment to the ACV calculation. This would obviously constitute a breach—if there is no indication the comparable vehicles had aftermarket leather seats, an insurer could not simply assume that they do to the detriment of its insured. And damages would be the amount of the increased ACV amount had the insurer not imposed the improper adjustment, i.e., $500.00.

Take another example, but with a different adjustment. Assume the 2020 Honda Civic, after the insured was safely away from the vehicle, exploded and was completely burned. Assume further that the insured has no recollection and there is no way to identify the mileage. Assume the insurer applied a proper methodology of calculating ACV—except it simply assumed the vehicle had 40,000 miles and made mileage adjustments to the comparable vehicles accordingly, in the amount of $0.05 per mile. Assume the average mileage of the comparable vehicles was 25,000, and thus the mileage adjustment resulted in a downward adjustment of, on average, $750.00. This would obviously constitute a breach—if there is no indication of what the mileage of the insured vehicle was, an insurer cannot simply invent a random number and adjust the ACV based on that invented number. And damages would be the amount of the increased ACV calculation had the insurer not made mileage adjustments, i.e., $750.00.

Plaintiff is bringing precisely such a claim. Progressive is taking the listed prices of comparable vehicles and simply assuming, without any basis whatsoever, that those vehicles will be sold for less than their listed price, and therefore applying a flat downward reduction to those listed prices. If this were the end of the story, it would be a breach in precisely the same way as the aforementioned hypotheticals: Insurers cannot make unfounded, evidence-free assumptions and make downward adjustments to its ACV calculations based on its imagined assumptions. But

7

it's worse—it is not merely that Progressive is assuming comparable vehicles are on average sold for a certain percentage less than their listed price; rather, ***Progressive knows such assumption is false***. In other words, to use the previous hypotheticals, it would be as if the insurer ***knew*** the vehicle had 27,000 miles, but made mileage adjustments as if it had 40,000 miles, or as if the insurer ***knew*** the comparable vehicles did not have leather seats, but made the adjustments as if they did.

With that background and broad explanation out of the way, Plaintiff now turns to the Motion to Dismiss.

## A. <u>Breach of Contract</u>

In Delaware, the elements of a breach of contract claim are (1) existence of a contract, (2) breach of a contractual obligation, and (3) resulting damages. *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Here, Plaintiff plausibly alleged he was insured under a contract of insurance. D.I. 11 at ¶ 12. Further, under the Policy's terms, he was entitled to payment of ACV, and Defendant breached the Policy by failing to pay ACV. *Id.* at ¶¶ 19, 24, 45, 78-80. Finally, Plaintiff was damaged because he did not receive the benefit of his bargain, in the amount of the difference between what he alleges is the ACV amount ($2,019.36) and what Defendant (mis)calculated ACV to be ($1,531.96), a total of $488.00. D.I. 11 at ¶ 46 and D.I. 11-3 at pg. 1. Thus, Plaintiff has stated a viable claim for breach of contract.

Defendant argues that because Plaintiff disclaims that this dispute concerns the amount of loss, she has failed to state a breach of contract claim because "loss" is what Defendant owes. D.I. 16 at 12-13. This entirely misses the point. There is no question Defendant did not pay the full loss

amount: Plaintiff's point is merely that Defendant is not **obligated** to pay the full loss amount.[2]

This is because a "total loss" occurs where it the amount of loss exceeds ACV, and thus insurers

invoke the ACV limitation rather than paying the full loss amount, i.e., the cost to repair or replace

the damage to a vehicle. D.I. 11 at ¶¶ 2, 6, 47. Instead, it is only obligated to pay the amount of the

loss to which its liability is limited. That amount—that obligation—is ACV, and Plaintiff's

allegations that Defendant failed to pay ACV states a valid claim. Numerous courts acknowledge

the truism that in the event of a total loss, ACV is the relevant obligation (a separate list of example

decisions can be presented at the Court's request). *See also* Couch on Insurance 3d at § 175:40, §

176:4 (ACV "is generally applicable for total-losses…[r]epair and replacement options are also

generally inapplicable to circumstances of total loss."; New Appleman On Insurance Law Library

Edition, Vol. 6 § 62.08(1)(a) (when a policy limits liability to the 'lesser' of the [ACV] or the

cost to repair or replace[,]" ACV is the relevant limitation "when…there has been a 'total loss.'. .

."). The question, then, is whether Plaintiff plausibly alleged Defendant paid less than ACV, the

answer to which is unquestionably "yes."[3]

---

[2] To put it simply, suppose Defendant determined the amount it would cost to repair the loss to a vehicle was $15.00 and that ACV was $10.00, and therefore only paid $10.00 because that was the limit (or ceiling) on liability. Suppose an insured claimed the ACV was $11.00, while explaining she did not dispute the amount of loss was $15.00. In this hypothetical, the insured has stated a valid claim—that Defendant underpaid ACV by $1.00—notwithstanding that she does not dispute and is not seeking the full loss amount of $15.00.

[3] Defendant briefly cites to *Sigler v. GEICO Cas. Co.*, 967 F.3d 658 (7th Cir. 2020). D.I. 16 at 13. But *Sigler* addressed merely whether, under Illinois regulations, sales tax and fees should be included in the ACV payment or can be withheld until an insured submits proof of replacement. *Id*. at 661. Although *Sigler*'s dicta implied the insured may not owe ACV at all, its holding was based on a regulation that only applied if the basis of the settlement was the vehicle's ACV (i.e., it only applied to totaled vehicle claims). Not only did *Sigler*'s dicta conflict with its holding, but it contradicted every case—again, literally thousands of cases—and insurance treatise that preceded it and the universal understanding in the insurance industry; presumably for this reason, courts outside Illinois have simply rejected *Sigler*'s dicta. *See, e.g.*, *Wright v. GEICO Cas. Co.*, 2021 U.S. Dist. LEXIS 184553, at *9-11 (M.D. La. Sep. 27, 2021) (rejecting Sigler because it failed to "address the interaction between the limitation of liability provision and the promise to

Plaintiff alleges that Defendant paid less than ACV through application of the arbitrary and invalid PSA. D.I. 11 at ¶¶ 22-44. Plaintiff alleges this adjustment is simply made up—the notion that used car dealers advertise vehicles at an amount higher than their market value and then negotiate down is antiquated and false. *Id*. at ¶¶ 5-10, 25-30. Plaintiff alleges that Defendant possesses data showing this to be the case—showing that sales prices match advertised prices— and simply ignores it and then represents that the opposite is true. *Id*. at ¶¶ 31-42. As such, Plaintiff's allegations that the ACV of vehicles do not include a PSA applied to online listed prices are (at minimum) plausible.

Numerous courts have recognized this principle. On identical facts, the Eighth Circuit held the plaintiff's allegations "stated a breach of contract based on the policy language." *Smith*, 18 F.4th at 981. In *Smith*, the plaintiff alleged his insurer used Mitchell valuation reports that contained the same PSAs that are at issue here. *Id*. at 980-81. There, as here, the plaintiff alleged such adjustments are "not reflective of the vehicle's fair market value," that "a 9% reduction on a used vehicle is not typical and does not reflect market realities," and that "dealers' actual practice is not to inflate prices above market value because of the intense competition in the context of

---

pay for loss"); *McNichols v. Geico Gen. Ins. Co.*, 2021 U.S. Dist. LEXIS 135674, at *13-14 (D. Conn. Jul. 21, 2021) (rejecting *Sigler* because it merely "summarily assert[ed] that a limit of liability section cannot be asserted as the basis of a coverage claim, without addressing the interplay between all of these contract terms"); *McPheeters v. United Services Automobile Association*, 549 F. Supp. 3d 737, 746-47 (S.D. Ohio 2021). Indeed, one court in this Circuit rejected the argument because it noted that while Progressive advanced such argument in briefing, its actual witnesses agreed ACV is owed for total-loss vehicles. *Davis v. Progressive Advanced Ins. Co.*, 2021 U.S. Dist. LEXIS 26954, at *3 (E.D. Pa. Feb. 12, 2021).

Indeed, in just the past week, the undersigned have deposed three Progressive witnesses in other cases, all of whom confirmed Progressive always purports to pay ACV in the event of a total loss. There is simply no question whatsoever that Progressive agrees it owes ACV to total-loss insureds, will testify as such in this litigation, and simply invented the argument solely for briefing. Respectfully, the Court should not allow itself to be misled by an argument that even Progressive does not believe is true.

internet pricing and comparison shopping." *Id.* (cleaned up). The court concluded that "[i]f this is true, then [defendant] did not consider the [vehicle's] fair market value; it considered an artificially lower value, in breach of its contractual duty . . . ." *Id.* at 981. Another court similarly denied a motion to dismiss a claim that an insurer breached its obligation to pay ACV by applying an 8.5% "typical negotiation" adjustment—which is equivalent to a PSA but under a different name. *Clippinger*, 2020 WL 6750357, at *16-18. The same result is called for here: The allegations that application of PSA constituted a breach of the obligation to pay ACV are plausible. *See also Zuern v. IDS Prop. Cas. Ins. Co.*, 2020 U.S. Dist. LEXIS 78260 (W.D. Wash. May 4, 2020) (denying MTD where defendant, through Mitchell, applied a 6.4% PSA).

Next, Progressive argues that Plaintiff did not sufficiently allege the underpayment or damages given that the deductible eliminated any payment to Plaintiff at all. D.I. 16 at 13. This is an odd argument; Plaintiff explicitly alleged damages were $488.00. D.I. 11 at ¶ 46, 79.[4] Progressive also suggests further deductions could have been made based on the salvage value of the vehicle. But Plaintiff did not allege she retained the salvage vehicle—whether Progressive could have imposed further deductions and what impact that may have had on her claim is therefore irrelevant at this stage of the litigation.

For these reasons, Defendant's request for dismissal of the breach of contract claim must be denied.

### B. Breach of the Covenant of Good Faith and Fair Dealing

Plaintiff alleges that Defendant breached the covenant of good faith and faith dealing when it applied an arbitrary, invented, and unsupported PSA to undervalue insureds' total-loss vehicles

---

[4] Progressive undercalculated the ACV to be $1,531.96. D.I. 11-3 at pg. 1. If Progressive had not imposed the PSA—if, in other words, Plaintiff is correct that the vehicle's ACV is $488.00 higher—then ACV is $2,019.96, which exceeds the $2,000.00 deductible.

and thereby failing to pay insureds the ACV of their total-loss vehicles. D.I. 11 at ¶ 87. Defendant asserts that Plaintiff's claim fails because it is purportedly duplicative of Plaintiff's breach of contract claim. D.I. 16 at pgs. 14-15. Defendant is wrong.

"Under Delaware law, the implied covenant of good faith and fair dealing inheres in every contract." *eCOMMERCE Indus. v. MWA Intelligence, Inc*., 2013 Del. Ch. LEXIS 245, at *107 (Del. Ch. Sep. 30, 2013). The implied covenant enforces the parties' contractual bargain by implying terms that the parties would have agreed to during their original negotiations if they had thought to address them. *See Gerber v. Enter. Products Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc*., 76 A.3d 808 (Del. 2013). "Under Delaware law, a court confronting an implied covenant claim asks whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter." *Id.*

It is important to note that "'Fair dealing' is not akin to the fair process component of entire fairness…. It is rather a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." *Id.* at 418-19. "Likewise 'good faith' does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract." *Id.* at 419. "The implied covenant requires that a party refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of its bargain. ***When exercising a discretionary right, a party to the contract must exercise its discretion reasonably***." *Id.* (original emphasis). While "[e]xpress contractual provisions always supersede the implied covenant,…even the most carefully drafted agreement will harbor residual nooks and crannies for the implied covenant to fill." *Id.* "In those situations,

what is 'arbitrary' or 'unreasonable'—or conversely 'reasonable'—depends on the parties' original contractual expectations[.]" *Id.*

Here, Defendant breached the covenant of good faith and fair dealing when it engaged in arbitrary and unreasonable conduct that prevented Plaintiff from receiving the fruits of her bargain. D.I. 11 at ¶¶ 82-87. The Policy promises to pay ACV and provides that ACV "is determined by the market value, age, and condition of the vehicle at the time the loss occurs." Policy at 24. Plaintiff alleges that to the extent this provides Defendant with at least some discretion in calculating ACV, Defendant exercised that discretion unreasonably and capriciously by applying the PSA. D.I. 11 at ¶ 86. Surely, had the issue been negotiated rather than left unspoken, the parties would not have agreed that Defendant can make flat, downward adjustments to ACV based on bare assumptions without any basis whatsoever, to say nothing of assumptions that Defendant knows to be false.[5] It is for this reason that courts addressing similar claims have agreed the plaintiffs stated a valid claim for a breach of the covenant of good faith and fair dealing. *Clippinger v. State Farm Mut. Auto. Ins. Co.*, 2020 U.S. Dist. LEXIS 214856, at *19 (W.D. Tenn. Nov. 17, 2020) (denying motion to dismiss claim that "typical negotiation" adjustment violated the covenant of good faith and fair dealing); *Zuern*, 2020 U.S. Dist. LEXIS 78260, at *17-18 (same); *Lundquist v. First Nat'l Ins. Co. of Am.*, 2018 U.S. Dist. LEXIS 113509, at *16-17 (W.D. Wash. Jul. 9, 2018) (same).

---

[5] Defendant makes an odd assertion that "this Court should decline any invitation from Plaintiff to inject implied terms into the Policy that are not already present." D.I. 16 at pg. 15. Of course, the whole point of the covenant of good faith and fair dealing is to imply contract terms, and the existence of a contract term "already present" would preclude the court from implying a term. *Johnson v. Gov't Emples. Ins. Co*., 2014 U.S. Dist. LEXIS 81403, at *12 (D. Del. June 16, 2014), which Defendant cites, is not relevant because, there, the Plaintiff argued that the elements of a statute with no private right of action should be read into a contract between the parties, and the court refused to find that the parties would have agreed to such a term had the parties thought to negotiate about the matter.

Finally, Defendant does not provide a single case in support of its assertion that the good faith and fair dealing claims must be dismissed as duplicative of the breach of contract claim. And in any event, the claim is inherently not duplicative—Plaintiff alleges that application of the PSA *expressly* violated the contract and, even if not, it violated the ***implied*** covenant of good faith and fair dealing. Obviously, nothing prevents Plaintiff from alleging alternative theories of liability.

Defendant's arbitrary and unreasonable conducted deprived Plaintiff of the fruits of her bargain, *i.e.* the ACV amount promised under the Policy. D.I. 11 at ¶¶ 33-34, 43-44, 84-87. Thus, Defendant breached the covenant of good faith and fair dealing, and Defendant's Motion to dismiss this claim should be denied.

**C. <u>Delaware Consumer Fraud Act</u>**

**1. Plaintiff alleges a claim under the DCFA with sufficient particularity.**

Defendant argues that Plaintiff does not meet the pleading requirements for a fraud claim under Fed. R. Civ. P. 9(b), and merely alleges "naked assertions." Defendant overstates the pleading requirements of Rule 9(b) as applied to DFCA claims. Delaware courts have adopted the reasoning of the Third Circuit in *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir. 1984), and have consistently held that allegations of "'date, place, or time' fulfill [the particularity] functions, but nothing in the rule requires them." *Id.* at 791. All that is required is that "the alleged fraud [be pleaded] sufficiently to place defendants on notice of the precise misconduct and fraudulent behavior." *Id.*; *Yavar Rzayev, LLC v. Roffman*, 2015 Del. Super. LEXIS 433, at *4 (Del. Super. Aug. 31, 2015) (collecting authorities). Delaware courts have warned that "an excessive focus on particularity [as to DCFA claims] could impair the flexibility and the just determination of cases." *Sammons v. Hartford Underwriters Ins. Co.*, 2010 Del. Super. LEXIS 134, at *4 (Del. Super. Apr. 1, 2010).

14

Plaintiff, here, sufficiently places Defendant "on notice of the precise misconduct" with which it has been charged. *Id.* Plaintiff alleges that Defendant imposes a PSA for the sole purpose of undervaluing total-loss vehicles and, in turn, underpaying insurance settlements. D.I. 11 at ¶¶ 1–5. Plaintiff alleges the PSA is contrary to market realities and ethical appraisal methodologies, both of which Plaintiff lays out it detail. *Id.* at ¶¶ 7–9, 25–30. Plaintiff further alleges that Defendant purposefully manipulates data to arrive at its arbitrary PSA amounts. *Id.* at ¶ 31. Defendant deceptively represents that the PSA is "an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)." *Id.* at ¶ 24. But Defendant excludes and ignores all relevant data that demonstrates that consumers do ***not*** negotiate a different price than the listed price. *Id.* at ¶ 31. For example, Plaintiff alleges that, until July 2021, Defendant excluded from its PSA calculations ***any*** transaction in which the listed price equaled the sold price of a comparable vehicle. *Id.* at ¶ 31. And Defendant continues to exclude from its calculations any evidence of transactions in which the sold price exceeded the list price. *Id.* at ¶ 33. In other words, Defendant calculates a PSA using only data from transactions that allows it to reduce the value of insureds vehicles. Defendant arbitrarily ignores all evidence that consumers do not, in today's market, negotiate down the price of an advertised vehicle. These allegations are detailed, specific as to date and time—although that is not even required for DFCA claims—and are more than sufficient to put Defendant on notice of its alleged misconduct. *See*, *e.g.*, *Johnson v. Geico Cas. Co.*, 516 F. Supp. 2d 351, 359 (D. Del. 2007) (findings that allegations that an insurance company commits fraud in the "manner in which the insured's claims were processed" are sufficiently particular to allege a DFCA claim); *Homsey v. Vigilant Ins. Co.*, 496 F. Supp. 2d 433, 435 (D. Del. 2007) (same); *Sammons*, 2010 Del. Super. LEXIS 134, *18 (same). Defendant's argument that these allegations are nothing more than "naked assertions" is, frankly, not true.

15

### 2.  Allegations that an insurance company commits an unlawful act when processing insurance claims are sufficient to state a claim under DCFA.

Defendant next argues that Plaintiff failed to plead any conduct that falls within the scope of the DCFA because, according to Defendant, "there is no allegation in the [FAC] of any alleged misrepresentation or omission in connection with the sale, lease, receipt, or advertisement of Plaintiff's insurance policy." (Doc. 16, p. 8). This misstates Plaintiff's allegations and the pleading requirements of the statute.

As to the latter, courts have consistently held that the "CFA provides a private cause of action for violations by an insurance company." *Johnson*, 516 F. Supp. 2d at 359. And courts have allowed claims to proceed relating to unreasonable ***construction*** of the policies or delays in payment. In *Homsey v. Vigilant Insurance Co.*, 496 F. Supp. 2d 433 (D. Del. 2007), for example, the plaintiffs alleged that the defendant-insurance company purposefully employed a "willfully perverse and unreasonable construction" of the insurance policy to support an unreasonably low payment. *Id.* at 437. This Court found that averments of "an alleged unreasonable delay in payment, as well as an alleged unreasonable construction of the Policy" were "sufficient to plead a claim under the DCFA." *Id.* Said another way, the adjustment of the claim and the construction of the insurance policy can ***demonstrate*** a colorable misrepresentation or other violation of the DFCA.[6]

Plaintiff's allegations fall within the scope of the DCFA based on this precedent. Plaintiff alleges that Defendant manipulates data to arrive at an arbitrary deduction to the value of insured

---

[6] To use an extreme example, if Defendant "interpreted" ACV to mean "half the cost of the vehicle," it would be no defense for it to argue that although it perhaps misinterpreted ACV, it nevertheless paid an amount pursuant to that misinterpretation and thus made no misrepresentations in connection with the sale of the Policy. Instead, an insurer's actions in claim adjustment can ***demonstrate*** that its assertions of what coverage would be provided were false.

vehicles. D.I. 11 at ¶ 3; 7; 10; 31; 33; 36. Plaintiff alleges that Defendant and its vendors ***know*** there is not a material difference between advertised prices and sales prices, and yet Defendant asserts that there is an 8% (on average) difference between advertised prices and sales prices. Plaintiff alleges that Defendant purposefully conceals the data manipulation from insureds, and conceals and misleads consumers about the basis of the PSA. *Id.* at ¶ 63. Plaintiff alleges that Defendant's concealments and omissions mislead consumers into believing that Defendant would cover the total value of their insured vehicles, as opposed to some reduced value based on the application of the PSA. *Id.* at ¶ 65. But for these intentional misrepresentations and omissions, Plaintiff alleges that she would have purchased insurance elsewhere. *Id.* at ¶¶ 70–80. These allegations are sufficient to plausibly allege a claim for consumer fraud under the DCFA.

### D.  **Declaratory Judgment**

For a controversy to exist under the Declaratory Judgment Act, there must be a substantial, definite, and concrete dispute bearing on the legal status of parties with adverse interests such that it warrants a declaratory judgment. *Edmunds Holding Co. v. Autobytel, Inc.* 598 F. Supp. 2d 606, 609 (D. Del. 2009) (citing *MedImmune, Inc. v. Greentech, Inc.*, 549 U.S. 118, 127 (2007)).[7]

"Disputes over the meaning or enforceability of a contract present actual controversies that may be settled through a declaratory judgment." *Guidant Sales Corp. v. George*, 2006 WL 3307633 (D. Minn. Nov. 14, 2006). When assessing whether claims for breach of contract and a declaratory judgment can be presented, courts in this Circuit generally consider two concerns. First, whether the claims are duplicative, such that the same relief would be granted without the claim for declaratory judgment and that the plaintiff would not be prejudiced by the dismissal.

---

[7] Defendant's suggestion that Plaintiff lacks standing to seek declaratory relief because she failed to allege that if the PSA had not been imposed, the ACV calculation would have exceeded the deductible is simply false. *See supra*, n.4.

*Butta v. GEICO Cas. Co.*, 400 F. Supp. 3d 225, 233 (E.D. Pa. 2019) (citing *SmithKline Beecham Corp. v. Continental Ins. Co.*, 2004 WL 1773713, at 1-2 (E.D. Pa. Aug. 4, 2004)). Second, whether hearing the two claims together would hinder judicial economy. *Id.* (citing *Nova Financial Holdings, Inc. v. Bancinsure, Inc.*, 2012 WL 1322932, at 4 (E.D. Pa. Apr. 17, 2012)).

Plaintiff has alleged sufficient facts which, when accepted as true, state a claim for declaratory relief. It is undisputed that the claim for declaratory judgment arises out of an insurance contract between Plaintiff and Defendant, and each side has interests adverse to the other. Specifically, the question presented is whether in adjusting and paying Plaintiff's, as well as putative Class members', total-loss claims, Defendant's Policy obligated it to pay ACV when it chose to settle those total loss claims on that basis and whether it is precluded from using comparable vehicles whose values have been artificially lowered through PSAs. Plaintiff takes the position that the Policy does not permit Defendant to undervalue claims on this basis, and alleges application of the PSA lowers total-loss valuations to below market value. Defendant, on the other hand, takes the position that it has authority to apply these adjustments, regardless of whether they are factually sound or not. Thus, the action seeks to determine rights and obligations of the parties under the insurance contract between Plaintiff and Defendant, and Plaintiff's injury would be redressed by the declaration she seeks. Further, Plaintiff's dispute is ongoing. Plaintiff has not been paid the amount she argues is due under the Policy's terms, and Defendant has refused to concede any liability or obligation to pay ACV without using comparable vehicles undervalued by a PSA.

In addition, Plaintiff's request for declaratory relief further satisfies the criteria outlined above because (i) it seeks prospective relief, and (ii) it is not subsumed by Plaintiff's breach of contract claim. Here, the requested declaratory relief is prospective in nature, seeking a declaration that any future applications of the PSA violate the terms of the Policy (as opposed to relief under

the breach of contract claim, which can only provide retrospective monetary compensation). Moreover, the claim for declaratory relief is not wholly subsumed by the claim for breach of contract. Rather, the declaratory relief claim can survive without the breach of contract claim, and the Plaintiff is allowed to plead alternative theories of liability. *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d 1302, 1321 (S.D. Fla. 2010) ("The Court agrees with Plaintiff's position. Fed. R. Civ. P. 8(d) allows pleading in the alternative, even if the theories are inconsistent. Defendants have not conceded that Plaintiff is entitled to recovery under the contract, and if the contractual claim fails, Plaintiff may still be entitled to recovery . . . ."). In addressing similar claims, courts have permitted claims for declaratory relief to advance. *Chadwick*, 2022 U.S. Dist. LEXIS 117926, at *3 ("The declaratory judgment claim also goes forward. It is probably suspenders over the belt of the contract claim. But Chadwick has standing to bring it. And there's no harm in leaving this request for relief in for now."); *Anysa Ngethpharat v. State Farm Mut. Auto. Ins. Co.*, 499 F. Supp. 3d 908, 919 (W.D. Wash. 2020) ("As the Plaintiffs correctly point out, they may pursue declaratory relief under 28 U.S.C. § 2201(a) 'whether or not further relief is or could be sought.'").

Moreover, it would be premature for the Court to determine the request for declaratory relief is subsumed by the breach of contract claim. Theoretically, Defendant may have affirmative defenses relevant to the breach of contract claim for Plaintiff or some absent Class members that do not apply to the request for declaratory relief. Or the Court could theoretically decide that it can decide the claim for declaratory relief—that Progressive cannot impose the PSA—on a class-wide basis, but that consideration of potential affirmative defenses and whether Progressive overpaid other elements of the claim (and thus whether a breach and resulting damages occurred) is better suited for individualized proceedings. To be clear, Plaintiff believes discovery and briefing will

19

show that the breach of contract claim is well-suited for class treatment. But the point is that, prior to discovery and development of the record, it would, respectfully, be premature for the Court to assume the claim for declaratory judgment is superfluous and serves no purpose. *See generally Johnson v. Geico Cas. Co.*, 516 F. Supp. 2d 351, 357 (D. Del. 2007) (acknowledging overlap between declaratory judgment claim and breach of contract claim but denying motion to dismiss declaratory judgment claim because "Plaintiffs remaining claims have not been fully developed, and therefore, the Court cannot fully evaluate the extent of the overlap so as to determine whether declaratory judgment would serve no useful purpose…."); *Fleisher v. Fiber Composites, LLC*, 2012 U.S. Dist. LEXIS 157343, at *12 (E.D. Pa. Nov. 2, 2012) (acknowledging overlap but holding it would be "premature" to assume entire overlap and noting that the defendant "does not articulate any way in which entertaining Plaintiffs' DJA claim would hinder judicial economy or inconvenience the parties").

For these reasons, Plaintiff has stated a claim for declaratory relief.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits the Motion should be denied in its entirety.


Dated: August 2, 2022                    */s/ David A. Felice*
                                        David A. Felice (#4090)
                                        **BAILEY & GLASSER LLP**
                                        2961 Centerville Road, Suite 302
                                        Wilmington, Delaware 19808
                                        Telephone: (302) 504-6333
                                        dfelice@baileyglasser.com

Amy L. Judkins (admitted *pro hac vice*)
Jacob L. Phillips*
**NORMAND PLLC**
3165 McCrory Place, Ste. 175
Orlando, Florida 32803
Tel: 407-603-6031
amy.judkins@normandpllc.com
jacob.phillips@normandpllc.com
ean@normandpllc.com

Andrew J. Shamis*
**SHAMIS & GENTILE, P.A.**
14 NE 1 st Avenue, Suite 705
Miami, Florida 33132
Tel: 305-479-2299
ashamis@shamisgentile.com

Scott Edelsberg*
Christopher Gold*
**EDELSBERG LAW P.A.**
20900 NE 30th Ave., Suite 417
Aventura, Florida 33180
Tel: (305) 975-3320
scott@edelsberglaw.com
chris@edelsberglaw.com

*Pro hac vice motions forthcoming

***Attorneys for Plaintiff & Proposed Class***